**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LOUIS E. MADDEN,

     *Plaintiff,*

*v.*                          CASE NO. 09-CV-14669

COMMISSIONER OF          DISTRICT JUDGE GERALD E. ROSEN
SOCIAL SECURITY,          MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability, disability insurance

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

benefits (DIB), and supplemental security income (SSI) benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 18.)

Plaintiff was 41 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 11 at 11, 84.) Plaintiff's employment history includes work as a Hi-Lo driver, security guard, truck driver, manufacturing operator, and auto mechanic. (Tr. at 113.) He indicated that the job he held for the longest period of time was that of truck driver. (*Id.*) Plaintiff last worked in 2006. (*Id.*)

Plaintiff filed the instant claims on April 12, 2007 (DIB and SSI), alleging that he became unable to work on July 6, 2006. (Tr. at 84, 88.) The claims were denied at the initial administrative stages. (Tr. at 41, 42.) In denying Plaintiff's claims, the Defendant Commissioner considered other nervous system disorders and affective disorders as possible bases of disability. (*Id.*) On September 24, 2008, Plaintiff appeared before Administrative Law Judge (ALJ) Laura Speck Havens, who considered the application for benefits *de novo*. (Tr. at 8-17.) In a decision dated February 24, 2009, the ALJ found that Plaintiff was not disabled. (Tr. at 17.) Plaintiff requested a review of this decision on April 23, 2009. (Tr. at 6.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on July 10, 2009, when the Appeals Council denied Plaintiff's request for review. (Tr. at 2-4.) On December 1, 2009, Plaintiff filed the instant suit *pro se* seeking judicial review of the Commissioner's unfavorable decision.

**B.    Standard of Review**

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S.

521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is

multifaceted in that a state agency makes an initial determination which can be appealed first to

the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S.

137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative

review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800

F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative

decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the

Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner

has failed to apply the correct legal standard or has made findings of fact unsupported by

substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir.

2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding

whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve

conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509

(6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course

for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of

the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse

v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations

about the claimant are to be given great weight, 'particularly since the ALJ is charged with

observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531

("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions

among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*,

336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective

complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, the court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of the court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r*

*of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

## C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program (DIB) of Title II, 42 U.S.C. §§ 401 *et seq.*, and the Supplemental Security Income Program (SSI) of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. BLOCH, FEDERAL DISABILITY LAW AND PRACTICE § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920.  *See also Heston,* 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work." *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540).  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner.  *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors."  *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

## D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2011,

and had not engaged in substantial gainful activity since July 6, 2006. (Tr. at 13.) At step two, the ALJ found that Plaintiff's dysautonomia, vasovagal syncope, and depression were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (*Id.*) At step four, the ALJ found that Plaintiff could return to some of his past relevant work, i.e., guard, salesclerk, delivery person, and blue print copier. (Tr. at 16.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 16.)

### E.      Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff has been treated for depression since October 2005 when he was hospitalized for depression and suicidal ideation he experienced after having lost custody of his child. (Tr. at 182, 307-13.) Upon discharge, it was noted that Plaintiff was oriented, cooperative, fluent in speech, logical and goal oriented, negative for suicidal ideation or any paranoid delusions or auditory or visual hallucinations. (Tr. at 183.) Plaintiff has a history of alcohol abuse but reports that he has not drunk alcohol since December 2004. (Tr. at 308.)

Plaintiff suffers from syncopal episodes stemming from a head injury he suffered in July 2006. Chandrakant Pujara, M.D., examined Plaintiff in July 2006 and, after conducting several tests, concluded that he was experiencing "[r]ecurrent episodes of dizziness probably representing unstable vasomotor state with past history of possible tilt-table test" and that Plaintiff's "[a]typical chest pain and dyspnea [was] probably noncardiac in origin." (Tr. at 195-96.)

On July 31, 2006, Plaintiff was referred to N. Nisar, M.D., who examined him and concluded that Plaintiff "seems to have dysautonomia causing his vasovagal syncope [and that t]he patient seems to have mild sensory neuropathy accompanying that." (Tr. at 234.) Dr. Nisar also

noted "electrodiagnostic evidence of sensory neuropathy involving the lower extremity as well as upper extremities; this seems to be axonal type."  (Tr. at 237.)

Also in July 2006, Daniel Harber, D.O., conducted a Holtor monitor study which revealed "normal sinus rhythm with normal heart rate variability and no significant ST-T wave changes, no significant supraventricular tachycardia, no ventricular tachycardia and interpolated premature ventricular contractions."  (Tr. at 201, 356.)[2]

In August 2006, Trupti Patel, M.D., completed a form for the Family Independence Agency indicating that Plaintiff could work at either his usual occupation or any job, but with the limitations that he not drive, climb, or work in a hot place.  (Tr. at 294.)  Dr. Patel also noted that Plaintiff could frequently lift 6-10 pounds, but could not stand, sit or walk any hours of the day. (Tr. at 293.)  At the same time, Dr. Patel noted that Plaintiff did not need any assistance meeting his needs at home and that he did not need any devices to aid in ambulation.  (Tr. at 293.)

In September 2006, Dr. Nisar noted that EMG testing showed "evidence of sensory neuropathy and the most common cause for that is hyperglycemia/diabetes mellitus."  (Tr. at 239.)

Plaintiff underwent a left heart catheterization, left ventriculography, aortography, and selective coronary arteriography by Judkin's technique on October 23, 2006 because of Plaintiff's recurrent complaints of chest pain.  (Tr. at 190.)  The tests revealed "mild" left ventricular diastolic dysfunction, "mildly reduced" left ventricular ejection fraction, mitral valve prolapse, and a normal aortogram and normal selective coronary arteriography.  (Tr. at 190-91.)  As a result, Chandrakant Pjuara, M.D., concluded that there was a "noncardiac etiology of the patient's chest pain. However, mitral valve prolapse and vasovagal instability . . . could be a contributing factor as

---

[2]I note that although Plaintiff's name appears at the top of this form and the information appears to relate to Plaintiff, the first paragraph denoting the patient's history describes Plaintiff as a "38-year old white female," which clearly Plaintiff is not.

well." (Tr. at 191.) It was determined that Plaintiff would be treated with a low-dose beta blocker and aspirin in addition to bacterial endocarditis prophylaxis. (Tr. at 191.)

In October 2006, Dr. Pujara noted that although Plaintiff had sought emergency room relief for chest pain several weeks prior, he was released "after two sets of enzymes" and, although he had undergone a cardiac catheterization and a stress test, the test results were negative. (Tr. at 194.)

In November 2006, Plaintiff was examined by N. Nisar, M.D., who concluded that Plaintiff "most likely does not suffer from central neurogenic causes of dysautonomia," but referred him to the University of Michigan hospital to be seen by a neuromuscular specialist. (Tr. at 213, 239.) An electroencephalographic (EEG) exam done at that time was "normal awake and drowsy . . . [with] no focal, lateralized or epileptiform features." (Tr. at 215.) A CT scan of the brain taken in November 2006 was also "normal." (Tr. at 225.) A CT scan of Plaintiff's abdomen taken in November 2006 was also normal, except for some fatty infiltration of the liver. (Tr. at 227.) On November 6, 2006, Dr. Patel indicated that Plaintiff could return to work on restricted duty, i.e., doing a "sit down job." (Tr. at 230.)

On April 12, 2007, Dr. Pujara noted that Plaintiff had experienced one episode of syncope since his last visit and that Plaintiff reported that "all his episodes always have been postural in nature [and that h]e has not had any episode while he was sitting." (Tr. at 98, 192, 205.) At that time, Dr. Pujara recommended that Plaintiff seek a different job that does not "entail prolong[ed] hours of standing in one position and particularly driving on the freeway." (Tr. at 193, 206.)

Plaintiff was also seen by Eduardo Garcia, M.D., on April 14, 2007. Dr. Garcia noted that all cardiac data was normal and that Plaintiff's chest pain was "atypical"; he recommended further testing to "rule out gastroesophogeal reflux disease." (Tr. at 207.) A chest x-ray taken on that date

showed "no acute lung process." (Tr. at 210.) On that same date, Rupti R. Patel, M.D., examined Plaintiff and found no abnormalities but, based on patient history, assessed Plaintiff as having ventricular tachycardia and syncopal events as well as a history of sleep apnea, hyperglycemia and pericardial effusion. (Tr. at 208-09.)

In June 2007, Thomas S. Rosenbaum, Ph.D., and Wanda M. Heinz, M.S., L.L.P., examined Plaintiff and concluded that Plaintiff has "Bipolar Disorder, NOS," alcohol abuse in full remission, is "unable to sustain gainful employment, inadequate finances, and a GAF score of 55." (Tr. at 249-50.) The report noted that Plaintiff "presents a history of mood disturbance that includes depression and hypomanic-like symptoms . . .[, that he] appears to have poor coping mechanisms and there is a history of only intermittent mental health treatment." (Tr. at 250.) The report further concluded that Plaintiff's "present prognosis is guarded." (Tr. at 250.)

A Psychiatric Review Technique completed in June 2007 concluded that Plaintiff has affective disorders (specifically, bipolar syndrome) and substance abuse addiction disorders, which are in remission. (Tr. at 254, 257, 262.) The reviewer also found that Plaintiff is mildly restricted in activities of daily living, moderately restricted in maintaining social functioning and maintaining concentration, persistence or pace, and had one or two episodes of decompensation, each of extended duration. (Tr. at 264.) There were no "C" criteria found. (Tr. at 265.)

A Mental Residual Functional Capacity (RFC) Assessment completed in June 2007 concluded that Plaintiff is moderately limited in the ability to understand and remember detailed instruction, the ability to carry out detailed instructions, and the ability to maintain attention and concentration for extended periods. (Tr. at 269.) However, it was found that Plaintiff is not significantly limited in his ability to understand and remember short and simple instructions or the ability to carry out those simple instructions, nor were there any limitations found in his ability to

perform in a regular schedule, sustain an ordinary routine, work with others, make simple decisions, or complete a normal work-day and workweek without interruptions. (Tr. at 269-70.) The assessment also found that Plaintiff was moderately limited in his ability to interact appropriately with the general public, maintain socially appropriate behavior, and respond appropriately to changes in the work setting, but was otherwise unrestricted. (Tr. at 270.)

A Physical RFC Assessment was conducted based on Plaintiff's "vasovagal problems" and it concluded that Plaintiff was able to occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk (with normal breaks) for about 6 hours in an 8-hour workday, sit (with normal breaks) for about 6 hours in an 8-hour workday and was unlimited in his ability to push or pull. (Tr. at 275.) The assessment noted that the vasomotor "syncope does not happen on a regular basis" and that "[o]ther lab tests are normal." (*Id.*) As to postural limitations, Plaintiff was found to be occasionally limited in climbing ladders/ropes/scaffolds and crouching and that he should avoid even moderate exposure to hazards, but was otherwise unlimited. (Tr. at 275-78.) The assessment found Plaintiff's complaints of "syncope spells" and "problems moving around" to be "partially credible." (Tr. at 279.) There was no treating source opinion to compare to these findings at this time. (Tr. at 279.)

In April 2008, Plaintiff's treating physician, Trupti Patel, M.D., completed a statement indicating that he had treated Plaintiff since July 2006, that Plaintiff's recurrent syncopal attacks would last for 12 consecutive months, that Plaintiff would need a 20-minute rest period every hour if he were to return to work, and that Plaintiff would need to lie down repeatedly or for a substantial period of time during the day, but that he was capable of performing reaching, handling, and fingering tasks. (Tr. at 288.) Dr. Patel further found that, based on the syncopal episodes, Plaintiff would not be able to lift any weight at all even occasionally, and that his ability to stand

or walk was limited to 2 hours total and his ability to sit was limited to 6 hours total or 2 hours without interruption in an 8-hour workday. (Tr. at 289-90.) Dr. Patel also found that Plaintiff was unable to perform any postural activities and that his ability to do handling and pushing or pulling tasks was limited by his condition. (Tr. at 290.) Dr. Patel further concluded that Plaintiff's condition would affect his ability to be exposed to heights, moving machinery, chemicals, temperature extremes and vibration. (Tr. at 291.)

The adult function report of April 28, 2007, which was filled out by Plaintiff's girlfriend, indicated that Plaintiff watches television, cares for his personal hygiene needs without assistance, drives a car alone and rides in cars, goes outside once daily, shops in stores for groceries, and handles his personal finances without assistance. (Tr. at 99-103.) The report also indicated that Plaintiff's conditions do not affect his memory or ability to understand or follow directions, nor does he need reminders. (Tr. at 103-04.) The report also indicated that Plaintiff is able to prepare his own meals, do his own laundry, do minor cleaning, play video games, read to his son when he visits, go to doctor's appointments and cooperate with his doctors. (Tr. at 104-05.) The report further indicated that although Plaintiff does not necessarily like authority figures, he "doesn't bother them either." (Tr. at 106.) Finally, the report indicated that Plaintiff "got fired for arguing with a co-worker by yelling at him." (Tr. at 106.)

Plaintiff's own report indicates that he lives alone, prepares his own meals, watches television, cares for his own personal hygiene, does dishes and laundry, drives a car but is afraid of passing out, shops for groceries, handles his own personal finances, is only able to walk for "2 or 3 minutes," and does not handle authority figures, stress or changes in routine well. (Tr. at 127-33.) In the remarks section, Plaintiff indicated that he "can only drive a few miles, . . . cannot sit very long, . . . cannot stand more than 1 or 2 minutes, . . . . [has] very strong depression . . . [and]

consistent dizziness, chest pain, . . . headaches, [and] shortness of breath."  (Tr. at 134.) Plaintiff

stated that he was fired from various jobs for "talking back to guard," "not walking to work in the

heat (afraid of passing out)," "talking back to insurance rep," and for "not returning to work with

Dr. Ok."  (Tr. at 144.)

A chest x-ray taken in December 2007 revealed "no active disease" of the heart.  (Tr. at

352.)

At the administrative hearing, the ALJ asked the vocational expert (VE) to assume a person

of Plaintiff's background and with the following restrictions:

> The hypothetical person can sit six hours out of an eight-hour day, can stand six
> hours out of an eight-hour day and can walk six hours out of an eight-hour day, can
> occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, can only
> occasionally climb ladders and crouch and the hypothetical person must avoid
> moderate exposure to heights and moving machinery.  Additionally, the hypothetical
> person has mental restrictions of the following, a fair ability to deal with the public,
> a fair ability to maintain attention and concentration, a fair ability to understand,
> remember and carry out complex and detailed job instructions, a fair ability to
> maintain personal appearance and hygiene, a fair ability to behave in an emotionally
> stable manner and a fair ability to adapt to changes in the workplace.

(Tr. at 37.)  The VE testified that such a person could perform Plaintiff's past relevant work as a

sales clerk, delivery person and blueprint copier, but that the jobs of detailer, shipping/receiving

clerk and auto mechanic would require crouching and kneeling beyond what the hypothetical

person could perform.  (Tr. at 37-38.)  Plaintiff's counsel the asked the VE to assume additional

restrictions of "moderate difficulties of maintaining social functioning and concentration,

persistence or pace with one or two episodes of decompensation each of an extended duration, [and

i]n assuming that, moderate would mean that he would be about 20 percent of the time off task,

could he perform any of the jobs you have enumerated?"  (Tr. at 38.)  Plaintiff's counsel noted that

these restrictions were included in the psychiatric review technique form completed by a social

security advisor.  (*Id.*)  The VE responded that such a person could not perform the jobs he

previously described. (*Id.*) When further asked to consider Dr. Patel's opinion that Plaintiff would need one 20-minute rest period every day and that he could only stand for two of the eight hours in a workday, the VE also concluded that such a person could not perform the jobs previously described. (*Id.*) Finally, Plaintiff's counsel asked whether a person who experiences dizziness every day could perform the previously described jobs, and the VE responded that he could not. (Tr. at 39.)

## F.     Analysis and Conclusions

## 1.     Legal Standards

The Commissioner's regulations state that the agency "will first compare our assessment of your residual functional capacity with the physical and mental demands of your past relevant work." 20 C.F.R. § 416.960(b). "If you can still do this kind of work, we will find that you are not disabled." 20 C.F.R. § 404.1520(f). "'By referring to the claimant's ability to perform a "kind" of work, [the regulations] concentrate[] on the claimant's capacity to perform a type of activity rather than [her] ability to return to a specific job or to find one exactly like it.'" *Boucher v. Apfel*, 238 F.3d 419, 2000 WL 1769520, at *7 (6th Cir. Nov. 15, 2000) (quoting *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995)).

In determining the level of exertion required by prior work, the testimony of the VE should be compared to the DOT. *Bauer v. Barnhart*, 168 Fed. App'x 719 (6th Cir. 2006). Simply asking the VE if his testimony is consistent with the DOT satisfies the requirements under Social Security Regulation 00-4p. *Martin v. Comm'r of Social Security*, 170 Fed. App'x 369, 375-76 (6th Cir. 2006).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether or not substantial evidence supports the ALJ's decision.

## 2. Substantial Evidence

Plaintiff contends that substantial evidence fails to support the findings of the Commissioner. (Doc. 13.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff specifically contends that the ALJ did not properly evaluate his GAF scores of 42 and 49 and did not properly discount the mental RFC assessments that contradicted the Commissioner's examining and reviewing psychologists, but instead improperly relied on her own lay assessment of the psychological evidence. (Doc. 13 at 12-16.) Plaintiff argues that the ALJ's determination that he possessed a "fair ability" to sustain the mental demands of work is not the same as the RFC's conclusion that Plaintiff's mental abilities are subject to "moderate limitations." (*Id.*) In addition, Plaintiff contends that the ALJ improperly discounted the opinions of Plaintiff's treating physician, Dr. Patel, and failed to properly evaluate Plaintiff's nonexertional limitations. (Doc. 13 at 16-20.) Finally, Plaintiff argues that the ALJ's decision to discount Plaintiff's credibility was not supported by substantial evidence. (Doc. 13 at 20-23.)

Defendant counters that Plaintiff did not meet his burden to show he is unable to return to work, that the ALJ properly discounted the opinion of Dr. Patel because it was inconsistent with other evidence of record, that Plaintiff has not been able to support his contention that there is a

meaningful distinction between "fair" and "moderate" limitations, that the ALJ did not need to consider limitations evidence by GAF scores of 42 and 49 in June and July 2007 when there was also evidence in the record of a GAF score of 55 in June 2007. (Doc. 18 at 10-16.)

Plaintiff replies that a "fair ability" is not coterminous with "moderate difficulties" or limitations and, even if it were, the ALJ's conclusion that Plaintiff could return to his prior work is erroneous. (Doc. 19 at 2-4.) Plaintiff further argued that substantial evidence did not support the ALJ's decision for the reasons stated in his motion and brief. (Doc. 19 at 4-7.)

### a. Weight given to treating source opinions

In weighing the opinions and medical evidence, the ALJ must consider relevant factors such as the length, nature and extent of the treating relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's evidentiary support, and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6). Therefore, a medical opinion of an examining source is entitled to more weight than a non-examining source and a treating physician's opinion is entitled to more weight than a consultative physician who only examined the claimant one time. 20 C.F.R. § 404.1527(d)(1)-(2). *See also Rogers*, 486 F.3d at 242 (stating that the "treating physician rule," which provides that "greater deference is usually given to the opinions of treating physicians than to those of non-treating physicians," is a key governing standard in social security cases).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." S.S.R. 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. "The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 Fed App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

I suggest that the ALJ's decision not to give controlling weight to Dr. Patel's various opinions that Plaintiff could not lift any weight at all, could not sit, stand, or walk for even one hour in an 8-hour workday, that Plaintiff would need a 20-minute rest period every hour, and would need to lie down for a significant period of time each day were properly discounted by the ALJ. These opinions of Dr. Patel do not contain "well-supported" "medically acceptable clinical and laboratory diagnostic techniques" and are, I suggest, "inconsistent with the other substantial evidence in [the] case record." *Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527(d)(2).

First, Dr. Patel's 2006 opinion is internally inconsistent. Dr. Patel found that Plaintiff could work at either his usual occupation or any job, with the limitations that he not drive, climb, nor work in a hot place. (Tr. at 294.) However, at the same time Dr. Patel also found that Plaintiff could not stand, sit or walk for even one hour of an 8-hour workday. (Tr. at 293.) This conclusion is not only inconsistent with his ultimate finding that Plaintiff could work but also with his contemporaneous notation that Plaintiff did not need any assistance meeting his needs at home and that he did not need any devices to aid in ambulation. (Tr. at 293.) I further note that on November 6, 2006, Dr. Patel indicated that Plaintiff could return to work on restricted duty, i.e., doing a "sit down job." (Tr. at 230.)

Dr. Patel's 2008 opinion is also internally inconsistent. Dr. Patel opines that Plaintiff would need a 20-minute rest period every hour if he were to return to work, that Plaintiff would need to lie down repeatedly or for a substantial period of time during the day, but nonetheless indicates that Plaintiff would be able to stand or walk for 2 hours and sit for 6 hours of an 8-hour workday. (Tr. at 288-90.) Sitting for 6 hours and standing or walking for 2 hours, I suggest, supports a finding that Plaintiff could work an 8-hour day. In addition, although Dr. Patel found in 2006 that Plaintiff could lift 6-10 pounds, in 2008 he determined that Plaintiff would not be able to lift any weight; there is no explanation for the decline in ability. (Tr. at 289-94.)

Furthermore, Dr. Patel's opinions that point toward disability are not supported by other medical evidence of record. Although Plaintiff has suffered from syncopal episodes since July 2006, as noted by Dr. Pujara in 2007, "all his episodes have been postural in nature" and he "has not had any episode while he was sitting." (Tr. at 98, 192, 205.) Therefore, Dr. Pujara recommended Plaintiff seek a job that does not require prolonged standing or driving. (Tr. at 193, 206.) Despite Plaintiff's complaints of chest pain, the results of Plaintiff's heart catheterization,

Holtor monitor study, and x-rays were basically normal, leading Dr. Pujara to conclude that there was a "noncardiac etiology" of the complaints of pain. (Tr. at 191, 201, 207-10, 356.) In addition, Dr. Nisar concluded that Plaintiff "most likely does not suffer from central neurogenic causes of dysautonomia." An EEG exam done at that time found Plaintiff "normal awake and drowsy . . . [with] no focal, lateralized or epileptiform features." (Tr. at 215.) A CT scan of the brain taken in November 2006 was also "normal." (Tr. at 225.) Finally, Dr. Garcia noted that all cardiac data was normal and that Plaintiff's chest pain was "atypical." (Tr. at 207.)

I therefore conclude that the ALJ properly discounted those portions of Dr. Patel's opinions that pointed to a disabling condition. Although Plaintiff contends that the ALJ is required to recontact the treating physician to clarify any perceived inconsistencies in his opinion under 20 C.F.R. § 404.1512(e) and SSR 96-5p (Doc. 13 at 18), "an ALJ is required to re-contact a treating physician only when the information received is inadequate to reach a determination on claimant's disability status, not where, as here, the ALJ rejects the limitations recommended by that physician." *Poe v. Comm'r of Social Security*, 342 Fed. App'x 149, 157 n.3 (6th Cir. 2009).

### b. Plaintiff's credibility regarding subjective complaints of pain

Social Security Regulations prescribe a two-step process for evaluating subjective complaints of pain. The plaintiff must establish an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain rising from the condition or (2) the objectively-determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain. 20 C.F.R. § 404.1529(b); *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)). If a plaintiff establishes such an impairment, the ALJ then evaluates the intensity and persistence of the plaintiff's symptoms. 20 C.F.R. §

404.1529(c); *Jones*, 945 F.2d at 1369-70. In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what may precipitate or aggravate the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses to alleviate her symptoms, and how the symptoms may affect the plaintiff's pattern of daily living. *Id.*

The issue is whether the ALJ's credibility determinations are supported by substantial evidence. An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility. *Walters*, 127 F.3d at 531. When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645 at *3 (6th Cir. Feb. 11, 1999) (unpublished).

After examining the record evidence, I suggest that substantial evidence supports the ALJ's findings, including the finding that Plaintiff's testimony regarding his level of pain was not fully credible. I note at the outset that the RFC assessment found Plaintiff's complaints of "syncope spells" and "problems moving around" to be "partially credible." (Tr. at 279.) As indicated earlier, although there is evidence of syncopal episodes, the evidence of record does not support a finding that it is a disabling condition. The Mental and Physical RFC Assessments are consistent with the ALJ's findings and the VE's testimony that Plaintiff can work or perform jobs in the light work area. (Tr. at 269-70; 275-78.) In addition, Plaintiff's girlfriend's and his own descriptions of his functional abilities supports the ALJ's conclusions. Plaintiff watches television, cares for his personal hygiene needs without assistance, drives a car alone, rides in cars, goes outside once

daily, shops in stores for groceries, handles his personal finances without assistance, has no memory problems caused by his conditions, has the ability to understand and follow directions, and does not need reminders. (Tr. at 99-104.) In addition, Plaintiff is able to prepare his own meals, do his own dishes and laundry, do minor cleaning, play video games, read to his son when he visits, go to doctor's appointments, and cooperate with his doctors. (Tr. at 104-06, 127-33.)

      **c.     Other arguments regarding nonexertional limitations**

      Plaintiff contends that the ALJ improperly ignored Plaintiff's GAF scores of 42 and 49 in June and July 2007 in favor of the score of 55 in June 2007 and that the ALJ's determination that Plaintiff possessed a "fair ability" to sustain the mental demands of work is not the same as the RFC's conclusion that Plaintiff's mental abilities are subject to "moderate limitations." (Doc. 13 at 12-16; Doc. 19 at 4-7.) A GAF score of 55 "signals the existence of moderate difficulty in social or occupational functioning." *White v. Comm'r of Social Security*, 572 F.3d 272, 275 (6th Cir. 2009) (citations omitted). A GAF score between 41 and 50 "means the patient has serious symptoms . . . or any serious impairment on social, occupational, or school functioning." (*Id.*)

      The only reference to 2007 GAF scores of 42 and 49 are in the ALJ's opinion; they do not appear in the record medical evidence. (Tr. at 14.) The only 2007 GAF score reflected in the medical evidence is one of 55 as determined by Dr. Rosenbaum and Wanda Heinz. (Tr. at 249-50.) Therefore, the GAF score of 55 is the only score upon which the ALJ could have and did properly rely.

      Since a GAF score of 55 equates to moderate limitations, the next question is whether the ALJ's reference to "fair ability" in the hypothetical rather than "moderate limitations" is sufficiently different to undermine the ALJ's findings. I suggest that it is not. *See Sprouse v. Astrue*, No. 08-246-GWU, 2009 WL 1707940, at *5 (E.D. Ky. June 17, 2009) (finding fair ability

for sustaining attention and concentration and moderate limitations in maintaining attention and concentration consistent with one another and the hypothetical's wording); *Benitez v. Astrue*, No. 04 Civ. 5188 (RJS), 2008 WL 2216276, at *10 (S.D.N.Y. May 23, 2008) (moderate limitations in work-related functioning consistent with fair ability to remember and carry out instructions and respond appropriately to co-workers).

I suggest that the ALJ's findings also follow the opinions of the vocational expert which came in response to detailed and proper hypothetical questions that accurately portrayed Plaintiff's individual impairments in harmony with the relevant objective record medical evidence. (Tr. at 226-28.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

**d.    Conclusion**

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

**III.   REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the

objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                   s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗
                                   CHARLES E. BINDER
Dated: October 27, 2010            United States Magistrate Judge


**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date: October 27, 2010            By    s/Patricia T. Morris
                                  Law Clerk to Magistrate Judge Binder